## BARGAIN MART, INC. *v.* MORDECHAI LIPKIS ET AL.
## (13669)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued May 9—decision released July 11, 1989

*S. Robert Jelley,* with whom were *Andrea G. Savoca* and, on the brief, *Cheever Tyler* and *Carolyn Wilkes Kaas,* for the appellants-appellees (defendants).

*Gary P. Sklaver,* with whom were *Irving H. Perlmutter* and, on the brief, *Willa B. Perlmutter,* for the appellee-appellant (plaintiff).

GLASS, J. The issue in this case is whether a sublessee's sublease survived the allegedly voluntary extinction of two superior leases. One sublessor had relinquished its superior lease by "rejection" under federal bankruptcy law and the other by stipulation in a summary process action. The defendants, Mordechai Lipkis and Ceasar's Bazaar Limited Partnership, have appealed from the trial court's judgment ruling that, because the sublessors' conduct constituted a "voluntary surrender" of the superior leases, the plaintiff, Bargain Mart, Inc. (Bargain Mart), has a valid and subsisting sublease.[1] We find no error.

In 1972, G. Harold Welch acquired the entire leasehold interest in the building at Two Church Street in New Haven from a prior tenant who, in 1962, had leased the property for a term of 102 years from the building's owners, the trustees of the estate of Edward Malley. (We hereinafter refer to the lease between the owners of the building and Welch as the Welch Lease.) Upon acquiring the lease, Welch immediately sublet the building for a twenty-nine year term to the Edward Malley Company (Malley Company). On February 13, 1979, the Malley Company in turn sublet a 3456 square

---

[1] The plaintiff cross appealed, claiming that the trial court's decision should be upheld on the theory of attornment. We do not reach this issue since we affirm the trial court's judgment on the grounds raised in the defendants' appeal.

foot portion of the building to Bargain Mart. The Bargain Mart sublease was for a term of fourteen years, to expire in 1993, with an option for an extension to the year 2001. In November, 1980, Outlet Department Stores, Inc. (Outlet), acquired the Malley Company's leasehold interest under Welch, subject to Bargain Mart's 1979 sublease. (We hereinafter refer to the sublease between Welch and Outlet, the assignee of the Malley Company, as the Outlet Lease.)

In January, 1982, Outlet filed a Chapter 11 petition in the bankruptcy court for the southern district of New York. Under 11 U.S.C. § 365 (a), Outlet had the option of either assuming or rejecting the unexpired portion of the Outlet Lease. Outlet attempted without success to sell or assign its lease. Thereafter, Welch applied to the bankruptcy court for an approval of Outlet's rejection of the lease. On May 6, 1982, the bankruptcy court determined that it was in the best interests of the bankrupt's estate to reject the lease and, with the parties' consent, approved the rejection. In approving the rejection, the bankruptcy court did not determine whether Outlet had defaulted on its lease obligations or whether Welch had had a corresponding right to terminate the Outlet Lease.

At some time prior to March 18, 1983, the trustees of the Edward Malley estate transferred the fee interest in the building to eleven individuals, collectively known as the "Malley heirs," subject to the Welch Lease. In February and March, 1983, the Malley heirs served two notices to quit on Welch and, on March 14, 1983, instituted a summary process action against him. The heirs sought immediate possession of the premises, claiming that Welch had failed to pay rent and taxes from November, 1982, through February, 1983. In response, Welch filed an answer and alleged several special defenses, including the defense that the Malley heirs had not given him proper notice as a

prerequisite to bringing the eviction action. He also commenced two lawsuits against the Malley heirs, claiming, inter alia, that he owned the property. Welch's suits sought a conveyance of the premises or, alternatively, a partition and an order for sale. Further, after the Malley heirs had initiated their summary process action, Land Enterprises, Inc. (Land Enterprises), a corporation controlled by members of Welch's family, obtained a 10 percent ownership interest in the premises. Land Enterprises itself subsequently brought partition proceedings against the Malley heirs. Further, by purchasing an ownership interest in the building, Land Enterprises became a plaintiff with the Malley heirs in the summary process action against Welch.

The Malley heirs and Welch settled the summary process action on April 13, 1984, by a stipulated judgment.[2] The trial court in the summary process action did not decide any of the claims in that case on the merits, including Welch's claim of improper notice of default. The trial court in the present case found that the stipulated judgment provided: "(1) That a judgment for immediate possession of the subject premises may enter in favor of the plaintiffs [Malley heirs and Land Enterprises]. (2) Said plaintiffs waive any and all rights and release Welch from any monetary claims arising from the former lease. (3) Welch to withdraw his two suits against the heirs. (4) The heirs agree they will not oppose the partition by sale of the subject property as sought by Land Enterprises, Inc., in its suit against the heirs. (5) Welch to assume sole responsibility and

---

[2] Edward Malley, a Malley heir, did not agree to the stipulated judgment. Several statements in the stipulated judgment exclude him from the agreement, for example: "Unless I have overlooked a party, Judge, that leaves one plaintiff, and that is plaintiff Edward Malley. And the record should reflect that insofar as Edward Malley is concerned, he does not release Mr. Welch from any claims of any kind whatsoever that he may have against him under the former lease between the parties."

liability for maintaining said property pending its sale in exchange for which Welch may retain whatever rentals he is receiving from the satellite stores occupying parts of said property."

In accordance with the parties' agreement, on July 2, 1985, the trial court in the Land Enterprises partition action rendered a judgment of partition by sale. The committee appointed by the court to sell the property scheduled a public auction for November 18, 1985. The committee sent the defendant Lipkis, who had expressed interest in the property, a packet of information indicating that the property was being sold subject to the "[l]eases and rights of tenants in satellite stores." That notice included a detailed schedule of the "satellite stores" and specifically referred to the Bargain Mart lease and its terms. On December 8, 1986, Lipkis and codefendant Ceasar's Bazaar Limited Partnership bought the building as a result of their successful bid at the auction sale. Upon purchasing the building, Lipkis executed a "bond for deed," or purchase and sale agreement, that indicated that the sale was "subject to the rights of tenants in possession."

The record discloses that, upon entering into its sublease of February 13, 1979, Bargain Mart tendered its rent payments to the Malley Company, and then to the Malley Company's assignee, Outlet. After Outlet had rejected its lease with Welch in the bankruptcy proceeding in 1982, Bargain Mart complied with Welch's direction to pay the rent to him. In February, 1986, following the order of partition in the Land Enterprises action against the Malley heirs, Bargain Mart sent its rent checks to the committee appointed by the court to sell the property. Further, beginning on July 10, 1985, Bargain Mart endorsed its rent check payments with the legend "lease ends 11-30-2001" or similar words. In January, 1987, Lipkis, the new owner, received from the committee Bargain Mart's rent check

dated January 8, 1987. Lipkis noted on the back that he accepted and negotiated the check without prejudice "to the landlord's assertion that tenant has no lease and has a month to month status." From February to November, 1987, Bargain Mart sent all rent checks to Lipkis. As had been Bargain Mart's practice since 1985, it noted on these checks that its sublease ended in the year 2001. Lipkis, however, noted on seven of the ten checks sent directly to him that the checks were accepted on the understanding that Bargain Mart had no lease and occupied the premises as a month to month tenant.

On October 5, 1987, Lipkis sent Bargain Mart a handwritten note stating "that since, in our analysis, you have no lease [and] are therefore a month to month tenant, we can not provide heat to your store, particularly since you are the only tenant remaining. It is impossible to run a heating system full time for only 1 1/2% of the [building]. We will run the central system [enough] so that the pipes do not freeze [and] you can supplement that with individual heaters. We still insist that you vacate the premises since you have no lease."

On November 13, 1987, Bargain Mart commenced the present action by application for a temporary injunction requiring the defendants to furnish heat for the premises in accordance with Bargain Mart's 1979 sublease. The trial court conducted a hearing on November 19, 1987, and, with the consent of the parties, entered an order requiring Lipkis to provide heat to the premises Bargain Mart occupied, pending resolution of the matter. On January 21, 1988, the defendants filed an answer and counterclaim seeking a declaratory judgment that the Bargain Mart sublease of February 13, 1979, had terminated, that Bargain Mart presently was a month to month tenant, and that the defendants were entitled to immediate possession of the premises. The trial court conducted a three day

hearing on the parties' claims and on May 25, 1988, rendered judgment for Bargain Mart on all claims. The court ruled that the sublease between the Malley Company and Bargain Mart of February 13, 1979, "is a valid and subsisting lease in full force and effect in all of its terms, conditions and covenants, to which the defendants are bound."

The defendants appealed the trial court's judgment to the Appellate Court and we transferred the appeal to ourselves pursuant to Practice Book § 4023. On appeal, the defendants claim that the trial court erred in: (1) ruling that the Outlet Lease and the Welch Lease had not been "terminated" by the lessor but had been "voluntarily surrendered" by the lessee, and therefore concluding that Bargain Mart's sublease of February, 1979, is in full force and effect; and (2) awarding Bargain Mart attorney's fees. We find no error.

I

Our review of the defendants' separate claims concerning the Outlet Lease and the Welch Lease is governed by the following general principles. In *Golde Clothes Shop, Inc.* v. *Silver,* 95 Conn. 678, 685–86, 112 A. 264 (1921), we stated: "A voluntary surrender by a principal lessee to a principal lessor, effected in a manner contrary to the provision of termination in the lease, does not affect the rights of a tenant acquired under a sublease which the lessor had authority to make. The surrender will end the rights of the principal lessor in his lease; it will leave the rights of his under-tenant unimpaired, and make of him the tenant of the principal lessor upon the terms of the sublease. 'That surrender, and the consequent merger of the greater and lesser interest, terminate[s] the original lease, and the term created thereby, as between the parties to the lease and the surrender. . . . The interests and the terms of the subtenant of the lessee [continue] as if no

surrender had been made. . . . [T]he surrenderees and owners in fee, bec[o]me the immediate landlords of the [subtenant], with only such rights as his lessor would have had to the possession of the premises before the expiration of the term.' *Eten* v. *Luyster,* 60 N.Y. 252, 259 [1875]. Every surrender by a principal lessee is voluntary, unless the lessor enforces the right of termination in accordance with the reservation of his lease."

*Golde Clothes Shop, Inc.,* establishes that "[t]he surrender of a lease by a lessee to his lessor, after a sublease, will not be permitted to operate so as to defeat the estate of the sublessee." 49 Am. Jur. 2d, Landlord and Tenant § 512. *Golde Clothes Shop, Inc.,* also implies, however, that unless the rights of the sublessee are protected by the terms of the sublease, "[t]he right of the sublessee to the possession of the premises, as against the original lessor, terminates with the lease or term of the original lessee . . . [Since] a subtenant holds the premises subject to the performance of the terms and conditions impressed upon the estate by the provisions of the original lease, his rights are generally held to be terminated when the original lessor declares a forfeiture of the original lessee's term based upon the latter's nonperformance of obligations imposed on him." 49 Am. Jur. 2d, Landlord and Tenant § 511.

A

The defendants first claim that the trial court erred in its determination that there was a voluntary surrender of the Outlet Lease with Welch when the bankruptcy court, on Welch's motion, approved Outlet's rejection of the lease.[3] They initially argue that a "rejec-

---

[3] Title 11 of the United States Code, § 365 (a) provides: "Except as provided in sections 366 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

tion" of an unexpired portion of a lease under the bankruptcy code necessarily constitutes a "termination" of the lease. See, e.g., *In re Hawaii Dimensions, Inc.*, 47 Bankr. 425, 427 (D. Hawaii 1985); *In re United Nesco Container Corporation*, 47 Bankr. 230, 233 (E.D. Pa. 1985). We disagree. Section 365 (h) (1)[4] of the bankruptcy code provides that, if a debtor/lessor rejects the unexpired portion of a real property lease, the determination of the lessee's rights turns on "applicable nonbankruptcy law." Where a debtor/sublessor has rejected the primary lease, state law establishes the subtenants' rights under the sublease. *In re Elmhurst Transmission Corporation*, 60 Bankr. 9, 10 (E.D.N.Y. 1986); see also *In re Dial-a-Tire, Inc.*, 78 Bankr. 13, 14 (W.D.N.Y. 1987) (where debtor/sublessor rejects both primary lease and sublease, sublessee's rights as against lessor determined by state law and not bankruptcy code); cf. *In re Picnic 'n Chicken, Inc.*, 58 Bankr. 523, 525–26 (S.D. Cal. 1986) (rejection under code does not conclusively terminate lease, but gives landlord option of terminating lease); *In re Storage Technology Corporation*, 53 Bankr. 471, 474–75 (D. Colo. 1985).

The defendants further argue that because the bankruptcy court granted Welch's motion to approve Out-

---

[4] Title 11 of the United States Code, § 365 (h) (1) provides: "If the trustee rejects an unexpired lease of real property of the debtor under which the debtor is the lessor, or a timeshare interest under a timeshare plan under which the debtor is the timeshare interest seller, the lessee or timeshare interest purchaser under such lease or timeshare plan may treat such lease or timeshare plan as terminated by such rejection, where the disaffirmance by the trustee amounts to such a breach as would entitle the lessee or timeshare interest purchaser to treat such lease or timeshare plan as terminated by virtue of it own terms, applicable nonbankruptcy law, or other agreements the lessee or timeshare interest purchaser has made with other parties; or, in the alternative, the lessee or timeshare interest purchaser may remain in possession of the leasehold or timeshare interest under any lease or timeshare plan the term of which has commenced for the balance of such term and for any renewal or extension of such term that is enforceable by such lessee or timeshare interest purchaser under applicable nonbankruptcy law."

let's rejection of the lease, Welch "terminated" the Outlet Lease in accordance with its terms and, therefore, Outlet's rejection could not possibly have been a "voluntary surrender" under *Golde Clothes Shop, Inc.* In connection with this argument, the defendants assert that the automatic stay provisions of the bankruptcy code precluded Welch from taking any legal action other than filing the motion to compel Outlet's rejection once Outlet had filed for bankruptcy. See 11 U.S.C. § 362 (a) (3).[5] Therefore, they claim, an application to approve Outlet's rejection was the only feasible method by which Welch could have terminated the lease. We are not persuaded.

"Whether there has been surrender and acceptance thereof is to be determined by the intention of the parties, and thus, it is usually a question of fact for the [trier]." 49 Am. Jur. 2d, Landlord and Tenant § 1095; cf. *Golde Clothes Shop, Inc.* v. *Silver,* supra, 688–89 (identifying parties' intent as critical to whether lessee had voluntarily surrendered lease). "On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record,

---

[5] Title 11 of the United States Code, § 362 (a) (3) provides: "Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under 5 (a) (3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee (a) (3)), operates as a stay, applicable to all entities, of . . . (3) any act to obtain possession of property of the estate or of property from the estate."

those facts are clearly erroneous." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

In the present case, paragraph 11 of the Outlet Lease contains the following relevant events of default: "(a) If Tenant shall default in the payment of the whole or any installment on part of the Basic Rent . . . and such default shall continue for a period of 15 days after the Landlord shall have given written notice thereof to the Tenant. . . . (c) If the Tenant . . . shall file a petition in bankruptcy." Paragraph 10 provides: "Upon the happening of any one of the Events of Default . . . the Landlord may, at any time during the continuance of such Event of Default, in its sole discretion, terminate this Sublease." See 11 U.S.C. § 365 (a). The trial court found that Welch's application to the bankruptcy court to compel Outlet to reject its lease did not constitute a "termination" within the meaning of *Golde Clothes Shop Inc.* It further found that Outlet's rejection of its lease was a "breach" amounting to a voluntary surrender.

We first note that the provision entitling Welch to terminate the lease if Outlet filed a bankruptcy petition was void under the bankruptcy code. 11 U.S.C. § 365 (b) (2) (B);[6] *In re Computer Communica-*

---

[6] Title 11 of the United States Code, § 365 (b) provides: " (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

"(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

"(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

"(C) provides adequate assurance of future performance under such contract or lease.

"(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—

*tions, Inc.,* 824 F.2d 725 (9th Cir. 1987). Consequently, Welch could not have relied on that provision to terminate the lease.

Further, since the Outlet Lease did not provide for termination by filing a motion to compel rejection in the event of the lessee's bankruptcy, Welch did not enforce "the right of termination in accordance with the reservation of his lease." *Golde Clothes Shop, Inc.* v. *Silver,* supra, 686. We disagree with the defendants' assertion that Welch's motion to the bankruptcy court to approve Outlet's rejection of the lease was his only feasible method of terminating the lease. Welch made

"(A)  the insolvency or financial condition of the debtor at any time before the closing of the case;

"(B)  the commencement of a case under this title; or

"(C)  the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

"(3)  For the purposes of paragraph (1) of this subsection and paragraph (2) (B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

"(A)  of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

"(B)  that any percentage rent due under such lease will not decline substantially;

"(C)  that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

"(D)  that assumption or assignment of such lease will not disrupt any tenant mix or balance in shopping center.

"(4)  Notwithstanding any other provision of this section, if there has been a default in an unexpired lease of the debtor, other than a default of a kind specified in paragraph (2) of this subsection, the trustee may not require a lessor to provide services or supplies incidental to such lease before assumption of such lease unless the lessor is compensated under the terms of such lease for any services and supplies provided under such lease before assumption of such lease."

no attempt to suspend the automatic stay under 11 U.S.C. § 362 (d),[7] nor did he thereafter express an intent to terminate the lease "by some unequivocal act clearly showing the exercise of that option"; *Mayron's Bake Shop, Inc.* v. *Arrow Stores, Inc.*, 149 Conn. 149, 156, 176 A.2d 574 (1961); such as by initiating a summary process action. See *In re Boston Business Machines*, 87 Bankr. 867, 870 (E.D. Pa. 1988). Although extrication from the automatic stay in this context "cannot easily be done"; id.; neither is it impossible. See *In re Aries Enterprises, Ltd.*, 3 Bankr. 472 (D.C. 1980).

In finding that Outlet "breached" the lease upon the bankruptcy court's approval of the rejection, the trial court implicitly found that Outlet had thereby surrendered the lease "in a manner contrary to the provision of termination in the lease . . . ." *Golde Clothes Shops, Inc.* v. *Silver,* supra, 685–86. Further, Welch's conduct subsequent to the rejection of the Outlet Lease, as well as his trial testimony, indicated that he treated Outlet's rejection as a "voluntary surrender" which he accepted. Welch never attempted to terminate Bargain Mart's tenancy as a result of the extinguishment of the Outlet Lease. Indeed, he testified at the present trial that the Bargain Mart "sublease was still intact" and was still in full force and effect after Outlet's rejection. Moreover, Bargain Mart continued to occupy the premises for the five years after Outlet's departure and

---

[7] Title 11 of the United States Code, § 362 (d) provides: "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

"(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

"(2) with respect to stay of an act against property under subsection (a) of this section, if—

"(A) the debtor does not have an equity in such property; and

"(B) such property is not necessary to an effective reorganization."

before the defendants purchased the property. The trial court could reasonably have inferred from this evidence that the parties intended the rejection of the Outlet Lease as a "voluntary surrender." Cf. *Associated Catalog Merchandisers, Inc.* v. *Chagnon,* 210 Conn. 734, 741, 557 A.2d 525 (1989), and cases cited therein (parties' conduct subsequent to act in issue evidence of intent regarding that act).

The defendants further argue that, as a matter of public policy, a bankrupt tenant should not be permitted unilaterally to breach a lease by "rejecting" it in bankruptcy and thereby impose upon the landlord the tenant's obligations to its subtenants. Since voluntary surrender is usually a question of fact, however; 49 Am. Jur. 2d, Landlord and Tenant § 1095; the determination of whether a rejection of a lease in bankruptcy operates as a "termination" or "voluntary surrender" will be tied to the particular circumstances of each case. In the present case, the trial court found that the rejection of the lease in the bankruptcy proceeding constituted a "voluntary surrender." The trial court's conclusion was not clearly erroneous. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra. Under these circumstances, the defendants' public policy argument is unpersuasive. Consequently, we conclude that the trial court did not err in determining that Bargain Mart's sublease was not terminated as a result of the rejection of the Outlet Lease.

B

The defendants next claim that the trial court erred in concluding that Welch had voluntarily surrendered his leasehold interest under his lease with the property owners, the Malley heirs, when he agreed to the stipulated judgment entitling the heirs and Land Enterprises to immediate possession of the premises. They assert that since the Welch Lease did not provide the method

of termination, the unequivocal act of service of a notice to quit sufficiently showed the Malley heirs' intent to terminate the lease. Therefore, according to this argument, the Malley heirs terminated the Welch Lease by service on him of two notices to quit. See *Chapel-High Corporation* v. *Cavallaro*, 141 Conn. 407, 411, 106 A.2d 720 (1954); *Housing Authority* v. *Hird*, 13 Conn. App. 150, 155, 535 A.2d 377 (1988); *Sandrew* v. *Pequot Drug, Inc.*, 4 Conn. App. 627, 630–31, 495 A.2d 1127 (1985); *Rivera* v. *Santiago*, 4 Conn. App. 608, 610, 495 A.2d 1122 (1985). We disagree.

The defendants' argument erroneously equates an unequivocal notice of intent to terminate a lease with a termination of the lease. As the Appellate Court correctly observed in *Bridgeport* v. *Barbour-Daniel Electronics, Inc.*, 16 Conn. App. 574, 582–84, 548 A.2d 744 (1988), however, a notice to quit will not terminate a lease if the notice itself is invalid. Indeed, it is self-evident that if the notice is invalid, then the legal consequence of "termination" arising from the service of a valid notice does not result.

In the present case, the Malley heirs served Welch with notice of default on January 27, 1983, and subsequent notices to quit on February 15, 1983, and March 1, 1983, claiming that he had failed to pay rent and taxes and had failed to maintain insurance as required by the lease. On March 14, 1983, the heirs instituted a summary process action against Welch, seeking immediate possession. Welch denied the allegations in the summary process action, and asserted several special defenses, including the defense that the heirs had failed to serve upon him proper notice to initiate the action. The parties eventually settled the dispute by a stipulated judgment. The trial court in the summary process action never reached Welch's special defense that the notices to quit were invalid.

A stipulated "judgment is not a judicial determination of any litigated right. . . . The essence of the judgment is that the parties to the litigation have voluntarily entered into an agreement setting their dispute or disputes at rest and that, upon this agreement, the court has entered judgment conforming to the terms of the agreement." *Bryan* v. *Reynolds,* 143 Conn. 456, 460, 123 A.2d 192 (1956). Such a judgment represents "a settlement of the controversy by the parties thereto [thus creating the presumption] that the parties intended to settle all aspects of the controversy, including all issues raised by the papers comprising the record." *Gagne* v. *Norton,* 189 Conn. 29, 34, 453 A.2d 1162 (1983); see also *Guille* v. *Guille,* 196 Conn. 260, 265, 492 A.2d 175 (1985). Because the trial court in the summary process action did not determine whether the notices to quit were valid, we have no basis for concluding that those notices terminated the Welch Lease.

We are not persuaded by the defendants' assertion that the trial court's conclusion means that a lease may be considered "terminated" only if the lessor wins in the summary process action. The trial court's conclusion did not make termination dependent on recovery of possession. The trial court's analysis, consistent with our own, only recognizes that an invalid notice to quit does not terminate the lease. *Bridgeport* v. *Barbour-Daniel Electronics, Inc.,* supra. Similarly, the Appellate Court's analysis relating to the "revival" of a terminated lease in *Housing Authority* v. *Hird,* supra, is irrelevant to the present case. In *Hird,* the landlord served the tenant with a notice to quit claiming that the tenant had violated the lease by maintaining the premises in an unsanitary condition and keeping pets. Id., 153. The tenant prevailed in the subsequent summary process action. The Appellate Court held that a "lease is neither voided nor rescinded until the landlord performs [an unequivocal act notifying the tenant

of termination] and, upon service of a notice to quit possession, a tenancy at will is converted to a tenancy at sufferance. *Mayron's Bake Shops, Inc.* v. *Arrow Stores, Inc.,* [supra, 156]; *Chapel-High Corporation* v. *Cavallaro,* [supra, 411] . . . . " Id., 155. The Appellate Court concluded, however, that because the tenant eventually prevailed at the summary process action, that judgment "revived" the original lease agreement. Id.

The defendants argue that, under *Hird,* there would be no reason for a judgment in favor of the tenant in a summary process action to "revive" the lease if the lease had not been terminated by the notice to quit. We have no reason, however, to review this proposition in the present case. In the summary process action by the Malley heirs against Welch, the validity of the notices to quit was in dispute, and the trial court made no findings or conclusions on that issue. There was no dispute about the validity of any notices to quit in *Hird,* or in our cases upon which the Appellate Court relied. *Housing Authority* v. *Hird,* supra, 153; *Mayron's Bake Shops, Inc.* v. *Arrow Stores, Inc.,* supra, 153, 156; *Chapel-High Corporation* v. *Cavallaro,* supra. Thus, the logical predicate to the *Hird* court's "revival" analysis—the existence of a valid notice to quit or, where the validity of the notice is in dispute, a finding of validity—was absent in the Malley heirs-Welch summary process action.

We are similarly unpersuaded by the defendants' further argument that Welch's voluntary acceptance of the stipulation cannot be equated with a voluntary surrender of the premises. The record shows that Welch purchased a 10 percent interest in the Two Church Street property through his family's Land Enterprises company after the Malley heirs had instituted the summary process action. The stipulated judgment provided that the heirs would not contest Land Enterprises' par-

tition action. It further provided that the Malley heirs would forego their claims against Welch for his alleged failure to pay rent and taxes. Thus, the trial court could reasonably have concluded that Welch, in foregoing his several special defenses and counterclaims, including the claim that he, in fact, was the owner of the property, voluntarily surrendered his lease. It also could reasonably have concluded that the Malley heirs accepted the surrender by waiving their claims against Welch. Further, as we have already indicated, a stipulated judgment is in essence a voluntary agreement. *Bryan* v. *Reynolds,* supra. The trial court's conclusion was, therefore, supported by the facts, and was legally and logically correct. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra, 221.

We also reject the defendants' final argument that affirmation of the trial court's judgment will "waste time, money and judicial resources" by requiring landlords who wish to terminate both the primary lease and the sublease to litigate a summary process action against the primary tenant and obtain judgment on the merits. Where a landlord has not terminated the tenant's lease, the landlord and tenant cannot unilaterally undertake to eliminate the sublessee's interests. *Byrd* v. *Peterson,* 66 Ariz. 253, 259, 186 P.2d 955 (1947). In the Malley heirs-Welch summary process action, termination of the Welch Lease was in dispute and was never resolved. Consequently, we conclude that the trial court did not err in ruling that the stipulated judgment between the Malley heirs and Welch did not extinguish Bargain Mart's sublease.

## II

The defendants argue that the trial court erred in awarding Bargain Mart attorney's fees, but concede that if Bargain Mart's sublease was valid, then so was the trial court's award of attorney's fees. Because we

conclude that the trial court did not err in ruling that Bargain Mart occupied the premises at Two Church Street under a valid and subsisting lease, the trial court also did not err in awarding attorney's fees.

There is no error.

In this opinion the other justices concurred.