On November 10, 1999, Sumlin Construction Co., L.L.C. (hereinafter "the LLC"), and Ray J. Sumlin (hereinafter "Sumlin") sued William Buck Taylor III and American Construction Corporation in the Mobile Circuit Court. Sumlin brought his action derivatively on behalf of the LLC and also asserted individual claims.[1] On February 23, 2001, the defendants filed an answer and counterclaim. In their counterclaim, the defendants alleged that Sumlin had violated the operating agreement of the LLC and had breached his fiduciary duty.
The parties filed a succession of pleadings and motions, resulting ultimately in the following dispositions pertinent to this appeal: a summary judgment was entered for the defendants as to all claims of both plaintiffs against both defendants and the counterclaim was dismissed. Later, however, the trial court reinstated the LLC's claims, only to again enter a summary judgment for the defendants as to them. While the LLC's claims were pending, the summary judgment against Sumlin was certified as final and appealable pursuant to Rule 54(b), Ala.R.Civ.P. After the summary judgment was entered on the LLC's claims, Sumlin and the LLC filed a notice of appeal. The appeal as to Sumlin was dismissed by this Court as untimely on April 12, 2002, because the time for taking his individual appeal, as triggered by the Rule 54(b) certification, had expired, and Sumlin's request to this Court for leave to file a Rule 60(b), Ala.R.Civ.P., motion with the trial court relative to his individual claims was denied. Accordingly, in the final analysis, the only claims eligible for consideration on this appeal are Sumlin's derivative claims on behalf of the LLC. We shall, nonetheless, continue to refer to Sumlin where appropriate.
Sumlin and the LLC argued on appeal that the summary judgment for the defendants on Sumlin's derivative claims was erroneous because, they say, the trial judge could not properly have held contrary to any of these propositions: 1) judicial estoppel would not apply against Sumlin; 2) the LLC and Sumlin are the real parties in interest for a derivative claim, or opposed to the trustee in Sumlin's bankruptcy proceeding; and 3) Sumlin possessed standing to bring the derivative action on behalf of the LLC. Because we consider the standing issue to be dispositive of the appeal, we *Page 305 
do not fully address the other two arguments.
Our review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997).
The record reveals that on April 23, 1998, Ray J. Sumlin entered into an operating agreement with William Buck Taylor III and American Construction Corporation (of which Taylor was the sole shareholder) to form Sumlin Construction Co., L.L.C. The operating agreement provided, in pertinent part:
 "The parties to this Agreement, desiring to form a limited liability company pursuant to the provisions of the Alabama Limited Liability Company Act (the `Act') hereby constitute themselves a limited liability company for the purposes and on the terms and conditions set forth in this Agreement.
 "NOW, THEREFORE, in consideration of the mutual promises of the parties, and of good and valuable consideration, the receipt and sufficiency of which hereby is acknowledged, it is mutually agreed by the parties as follows:
 "1. Formation and Name. The parties to this Agreement have formed a limited liability company under the name `SUMLIN CONSTRUCTION CO., L.L.C.' (the `Company'), pursuant to the provisions of the Act and this Agreement.
". . . .
 "5. Members and Percentage Interest. The names . . . of the Members of the Company are Ray J. Sumlin . . . and American Construction Corporation. . . . Member American Construction Corporation shall have a financial interest in the company of five-sixths (5/6ths) until such time as it shall have received $150,000 plus an additional amount equal to a factor of 9% per annum on the outstanding balance, from time to time. At such time, its financial interest shall be reduced to 50%. Member Sumlin shall have a financial interest [in] the company of 1/6th, until such time as he shall have received $30,000, plus an additional amount equal to a factor of 9% per annum on the outstanding balance, from time to time. At such time, his financial interest shall be increased to 50 percent interest. *Page 306 
". . . .
 "6.1 Contributions: Member American Construction Corporation shall contribute $150,000 in cash or acceptable securities to the company, and Member Sumlin shall contribute certain items of equipment to be agreed upon by the Managers having a value of $30,000.
". . . .
 "7.1 The management of the Company shall be vested in two Managers who shall be Ray J. Sumlin and William Buck Taylor, III. Either Manager shall have the right to name a substitute for himself. Manager Taylor may not be replaced without the permission of American Construction Corporation, and then it shall have the right to name his successor. Manager Sumlin shall not be replaced without his permission, and he shall have the right to name his successor.
 "7.2 The Managers may, from time to time, designate a person or entity to act as Administrative Manager of the Company who may be known as President. Ray J. Sumlin shall serve as the initial Administrative Manager. The Administrative Manager shall be the principal executive officer of the Company, and subject to the control of the Managers, shall in general supervise and control all of the business and affairs of the Company. He shall, when present, preside at all meetings of the Members and Managers. He, or other Managers designated by a majority of the Managers, may sign deeds, mortgages, bonds, contracts, or other instruments which the Managers have authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Members or shall be required by law to be otherwise signed or executed. . . .
". . . .
 "11. Restrictions on Members. No member without the prior written consent of all the Managers, shall:
"(a) Mortgage or pledge the Member's Interest in the Company;
 "(b) Assign, transfer, pledge, compromise, or release any claim of the Company, or arbitrate or consent to the arbitration of any disputes or controversies involving the Company;
 "(c) Use the name, credit or property of the Company for any purpose other than a proper Company purpose;
 "(f) Do any act in conflict with the Company business or which would make it impossible to carry on its business.
 "12. Substitute Members. No Member shall have the right to grant the right to become a substitute member to an assignee of any part of his interest, except with the prior written consent of all of the Managers or as otherwise provided herein or as provided in the Articles of Organization.
 "13. Withdrawal. Prior to the dissolution and winding up of the business of the Company, no Member may voluntarily withdraw from the Company except with the prior written consent of all of the Managers.
". . . .
 "16. Waiver or Partition. The Members hereby waive any right to take any other action that otherwise might be available to them for the purpose of severing their relationship with the Company or their interest in *Page 307 
the assets held by the Company from the interest of the other Members.
 "16.11 Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama."
The articles of organization of the LLC provide, in pertinent part:
 "ARTICLE II
"The LLC shall have perpetual duration.
". . . .
 "ARTICLE VI "The transfer of membership interest and the admission of additional members shall be governed by Sections 31, 32, 33, 34, and 35 of the Alabama Limited Liability [Company] Act, as amended from time to time, to the extent the same is not contrary to the Operating Agreement, as amended from time to time, except that the consent required in each instance of admission, transfer or assignment shall be that of 100% of the Managers. The Members shall not have the right to vote or consent to the admission of Members or the transfer or assignment of interests in the LLC.
 "The above notwithstanding, any Member shall have the right to transfer to any other Member their interests, (or any part thereof) including all rights incident thereto, without the consent of any other Member or any Managers."
Subsequently, Taylor contributed the $150,000 start-up funds in the form of certificates of deposit issued by First Community Bank ("CDs").
On October 15, 1998, Taylor requested from Sumlin copies of all of the "bonding applications" and also the CDs. Although Sumlin questioned in a letter to Taylor the motives behind Taylor's requests, Sumlin released the CDs to Taylor. In late November 1998, Taylor cashed the CDs, without notifying Sumlin, and placed the money in his personal account; he used the money to pay off some promissory notes evidencing loans American Construction Corporation owed him. Sumlin and the LLC alleged in their complaint that "[t]he cashing and conversion of the Certificates of Deposit constituted a breach of the operating agreement," and "as a consequence of the agreement, the [LLC] remained under-funded and was unable to engage in business as had been agreed to in the operating agreement." Ultimately, the LLC was unable to obtain financing and halted all business activities.
After discovering that the CDs had been cashed, Sumlin consulted with an attorney, who sent a letter to Taylor and American Construction Company on March 22, 1999. The letter states, in pertinent part,
"Dear Dr. Taylor,
 "Tim Renkle called me in response to my letter of March 4, 1999. Basically, he suggested that you would prefer to withdraw from Sumlin Construction Co., LLC, that you had received the return of all of your funds except $25,000, and that you would want Ray to sign a note to you, with a reasonable amortization, for the $25,000.
 "I met with Ray on Friday, and we discussed at length your proposal. Ray has an entirely different outlook on the situation.
 "Ray says that in approximately December of 1997, you approached him stating a desire to help him, by investing money in his company. We are all aware that in May of 1998, Sumlin Construction Co., LLC was formed. Although the Operating Agreement was *Page 308 
not what Ray had originally anticipated, it is ultimately what he agreed to. The agreement provided that American Construction Corporation would contribute $150,000 in cash or acceptable securities to the company. Ray has indicated that this did not occur until approximately August of 1998. From August of 1998 through December of 1998, Ray operated the company, proceeded to obtain bonding, did obtain some bonding, and proceeded then to bid on various work.
 "He was successful bidder recently, but then discovered that you had cashed the Certificates of Deposit, and he no longer would have bonding capacity. It is now apparent that you did not intend to honor the original agreement as put in writing.
 "Ray feels that he has lost more than one year of his life trying to get reestablished. The $25,000 which was left in the LLC has been spent. He spent in excess of $11,000 obtaining insurance, which was really wasted because when he got a bid approved, and would need the insurance, he could not perform because of lack of financial capacity. He has drawn less than $5,000 from the company since its inception. The various expenses of the company have eaten away at the remaining money, so that there are virtually no funds in the company. Ray does not feel that the company owes you the return of the $25,000, but rather that you and American Construction Corporation owe him for breach of contract and what he has earned, and what he would earn in the foreseeable future. As an example, he anticipated $25,000 in profit with reference to the bid on which he was recently successful.
 "Needless to say, Ray is very frustrated, and very disappointed. He now realizes that you do not intend to fund the company in accordance with the original agreement. The fact that the Certificates of Deposit were cashed without notice to him is very disappointing. Had he been advised that the Certificates were cashed, he would have gotten a 90-day start on his position, and would have saved a lot of effort.
 "Unless you advise us immediately to the contrary, we are going to have to assume that Sumlin Construction Co., LLC is no longer in business, and Ray will have to look at another way to earn a living. He will have to do so by either going into the construction business himself, or going to work for another company. In the meantime, Ray feels that he is owed by you and your corporation a substantial sum of money for having wasted in excess of one year of his life, and for breach of contract. We will advise that by way of compromise, and not being admission of a limitation on the amount of damages that he has suffered, that if you would pay Ray $25,000, and either join in a dissolution of the LLC or convey to him your interest in the LLC, and each of you thereafter will sign a complete release to the other, Ray would settle on that basis. When I speak of you, I mean you and your corporation. If that is not satisfactory, and you cannot come to an accommodation, Ray has indicated that he would desire to file legal action against your company, and perhaps you as well, because he does not feel that he can simply sit and have advantaged [sic] taken of him.
 "My practice has evolved to the extent that I am no longer handling litigation matters. However, we have been in contact with another attorney who has indicated a willingness to pursue this matter on behalf of Ray, but before we engage him, we wanted to offer you the *Page 309 
opportunity to settle the matter on the basis that I have set forth."
On May 28, 1999, Sumlin filed in the United States District Court for the Southern District of Alabama a voluntary petition in bankruptcy under Chapter 7. The LLC was not listed as a debtor in the bankruptcy petition or otherwise a direct participant in the bankruptcy proceeding. In the petition, Sumlin disclosed his 1/6 interest in the defunct LLC, valuing it at $1.00, and claimed wages due from the LLC, also valuing them at only $1.00. Sumlin claimed in his petition that both his interest in the LLC and his wages were due to be recognized as exempt from bankruptcy administration pursuant to Ala. Code 1975, § 6-10-6. No party to the bankruptcy proceedings, including the trustee, filed a motion to limit the amount of the claimed exemptions or otherwise challenged the exemptions. Sumlin did not list any potential action against the defendants on the "statement of affairs," constituting a section of the petition.
On September 1, 1999, Sumlin was granted a full discharge by the bankruptcy court, and on October 18, 1999, the bankruptcy proceeding was closed. On November 10, 1999, Sumlin filed this action in the Circuit Court of Mobile County.
Taylor's affidavit supporting his motion for a summary judgment stated, in part:
 "I received a letter on behalf of the plaintiff in this action, Ray Sumlin, dated March 22, 1999, which was addressed to me and to American Construction Corporation. In that letter, Mr. Sumlin's attorney complained about certain matters which formed the basis of this particular lawsuit. It was further suggested that I (or American Construction Corporation) pay the sum of $25,000.00 in order to avoid any legal action. It is my understanding that Mr. Sumlin filed a subsequent individual bankruptcy petition under Chapter 7 of the United States Bankruptcy Code, yet he failed to list any of these potential claims against American Construction Corporation or myself in that proceeding.
 "Both American Construction Corporation and I have been significantly harmed by Mr. Sumlin's failure to list any of these claims which have been raised in the case at bar in the bankruptcy proceeding. Had Mr. Sumlin done so, then it is highly likely that this matter would have either never come to litigation, or would have been resolved during the pendency of the bankruptcy proceeding, instead of lingering on for an additional two year period[,] as I would have made every reasonable effort to resolve it. We would have saved significant sums of money for attorneys fees and other expenses associated with this litigation, along with the resultant anxiety and stress which lengthy litigation brings. If these matters were not resolved, then I understand that I could have also raised the issues which I have set out in my counterclaim in this particular action as a set off in the bankruptcy proceeding. It is my understanding that our counterclaim in this particular lawsuit may be barred by certain provisions of the United States Bankruptcy Code since Mr. Sumlin has received a discharge from the Bankruptcy Court. Finally, I have also spent excessive amounts of time responding to this litigation."
Sumlin later attempted to amend his original bankruptcy petition to include reference to the action, but was denied leave to do so by the bankruptcy court on September 25, 2001.
Section 10-12-25 of the Alabama Limited Liability Company Act, §10-12-1 et seq., Code of Alabama 1975, provides for derivative actions on behalf of limited *Page 310 
liability companies and specifies who has standing to institute such an action:
 "(a) A member may bring an action in the right of a limited liability company to recover a judgment in its favor if the members or managers with authority to do so have refused to bring the action or if an effort to cause those members or managers to bring the action is not likely to succeed.
 "(b) In a derivative action, the plaintiff shall be a member at the time of bringing the action or have succeeded to the right of a member.
 "(c) If a derivative action is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise, or settlement of an action or claim, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct the plaintiff to remit to the limited liability company the remainders of those proceeds."
(Emphasis added.)
The parties' arguments concerning Sumlin's standing to prosecute the derivative action revolve around the application of § 10-12-36, a portion of the Alabama Limited Liability Company Act. In pertinent part, that Code section provides:
 "(b) Subject to contrary provisions in the operating agreement,[2] or written consent of all members at the time, a person ceases to be a member upon the occurrence of one or more of the following events listed in the following subdivision or paragraphs:
(1) The member:
". . . .
"b. Files a voluntary petition in bankruptcy.
"c. Is adjudicated bankrupt or insolvent.
". . . ."
(Emphasis added.)
Sumlin argues that the operating agreement qualifies as an executory contract under the terminology of 11 U.S.C. § 365(e)(1), a part of the United States Bankruptcy Code and that § 10-12-36(b)(1) b. and c. each represents an "ipso facto clause" that is rendered unenforceable by § 365(e)(1). Section 365(e)(1) provides as follows:
 "(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on —
 "(A) the insolvency or financial condition of the debtor at any time before the closing of the case;
"(B) the commencement of a case under this title; or
 "(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement." *Page 311 
For the reasons hereinafter stated, we disagree with Sumlin's analysis of the effect of § 365(e)(1) on § 10-12-36(b)(1). We agree, however, with his contention that the operating agreement constitutes an executory contract for purposes of § 365(e)(1). The Bankruptcy Court for the District of Nebraska discussed executory contracts in In reDaugherty Construction, Inc., 188 B.R. 607 (Bankr.D.Neb. 1995). The court stated, in pertinent part:
 "Each LLC is an ongoing business. The continuation of business contemplates an ongoing relationship and mutual obligations between each LLC's members. The member relationships are essentially executory in character. The Bankruptcy Code does not define the term `executory contract.' However, this circuit has adopted the `Countryman' definition. See In re Knutson, 563 F.2d 916, 917 (8th Cir. 1977) (quoting V. Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn.L.Rev. 439, 460 (1973)).[1] Under this definition, contracts are executory if they are so far unperformed that the failure of either party to complete performance would constitute a material breach excusing the performance of the other. Id. In this context, a wide range of agreements constitute `executory contracts,' see e.g., Knutson, supra (airline ticket purchase was executory contract), including partnership agreements and joint venture agreements. See In re Petralex Stainless, Ltd., 78 B.R. 738 (Bankr.E.D.Pa. 1987) (joint venture); In re Corky Foods Corp., 85 B.R. 903, 904
(Bankr.S.D.Fla. 1988) (partnership agreement).
 "[1] The legislative history of section 365 states that the term executory contract `generally includes contracts on which performance remains due to some extent on both sides.' See Cameron v. Pfaff Plumbing and Heating, Inc., 966 F.2d 414, 416 (8th Cir. 1992). This statement was quoted approvingly by the Supreme Court in NLRB v. Bildisco Bildisco, 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482
(1984). . . ."
188 B.R. at 612. The federal judicial circuit that includes Alabama has also approved the "Countryman" definition of "executory contract." SeeGibson v. Resolution Trust Corp., 51 F.3d 1016 (11th Cir. 1995) (citingGibson v. RTC, 750 F. Supp. 1565, 1569 (S.D.Fla. 1990), citing, in turn,In re Brada Miller Freight Sys., Inc., 702 F.2d 890, 894 n. 10 (11th Cir. 1983)). See also Sumlin Inv. Dev. Corp. v. LeRoux (In reLeRoux), 167 B.R. 318 (Bankr.E.D.Mass. 1994) (limited partnership agreement is an executory contract). Accordingly, we conclude that the operating agreement is an executory contract for the purpose of analysis under 11 U.S.C. § 365(e)(1).
Regarding the interplay between § 365(e)(1) and "ipso facto clauses," the Connecticut Court of Appeals stated in Days Inn ofAmerica, Inc. v. 161 Hotel Group, Inc., 55 Conn. App. 118, 739 A.2d 280
(Conn. 1999):
 "An ipso facto clause is a provision found in an unexpired lease or executory contract that terminates solely due to the financial condition or bankruptcy filing of a party. In re Lee West Enterprises, Inc., 179 B.R. 204, 209 (Bankr.C.D.Cal. 1995). Although for many years such clauses were permitted, in 1978 the Bankruptcy Code rendered such ipso facto clauses ineffective after the commencement of a bankruptcy proceeding. 11 U.S.C. § 365(e); In re Lafayette Radio Electronics Corp., 7 B.R. 189, 191-92
(Bankr.E.D.N.Y. 1980); cf. Bargain Mart, Inc. v. Lipkis, 212 Conn. 120, 130, 561 A.2d 1365 (1989)."
(Footnote omitted.)
It is to be noted that § 365(e)(1) initially refers to "a provision in an executory *Page 312 
contract or unexpired lease, or in applicable law," but then refers only to "a provision in such contract or lease" in specifying the prohibited framework for an ipso facto clause:
 "(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on —
 "(A) the insolvency or financial condition of the debtor at any time before the closing of the case; [or]
"(B) the commencement of a case under this title. . . ."
(Emphasis added.) The United States Court of Appeals for the Fifth Circuit has concluded that the omission of the phrase "or in applicable law" from the triggering portion of § 365(e)(1) is significant. InPhillips v. First City, Texas-Tyler, 966 F.2d 926 (5th Cir. 1992), that court noted:
 "Moreover, section 365(e)(1) by its terms only supersedes conflicting law if that law supports termination or modification of rights in an executory contract `solely because of a provision in such contract.' Id. No one contends that a contract deprived HSP of authority to act on P P's behalf after declaring personal bankruptcy; MJP claims that Texas law has this effect. See 2 Collier on Bankruptcy § 365.06 at 365-48, -49 (reciting legislative history of section 365(e) indicating its function as an `express prohibition against the enforcement of bankruptcy termination clauses'). Thus, HSP may not employ section 365 to avoid [the Texas statute]."
Likewise, in this case, there is no ipso facto clause in the operating agreement. Rather, the provision for cessation of limited liability company membership is an integral feature of the Alabama Limited Liability Company Act, as codified at § 10-12-36(b). However, because, we find that 11 U.S.C. § 365(e)(2), discussed next, serves to render § 365(e)(1) inapplicable to the facts of this case, we need not decide whether an ipso facto provision found in applicable Alabama law, but not appearing in an executory contract, is otherwise beyond the reach of § 365(e)(1).
Section 365(e)(2) provides, in pertinent part:
 "(2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if —
 "(A)(i) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
 "(ii) such party does not consent to such assumption or assignment. . . ."
Here, because we conclude that the operating agreement is an executory contract involving in significant part the contribution of personal services by Sumlin, Alabama law would allow the defendants to refuse to accept any proposed performance of those services by the trustee in bankruptcy and would prohibit Sumlin from assigning the contract to the trustee. See Sisco v. Empiregas, Inc., 286 Ala. 72, 76-77, 237 So.2d 463,466-67 (1970) ("We commence with the general proposition that *Page 313 
personal service contracts are not assignable. . . . Whether a contract is personal is largely a matter of the intention of the parties thereto and the `intention of the parties to a written contract is derived from the provisions of the contract.'"); Skeen v. Harms (In re Harms), 10 B.R. 817,821 (Colo. 1981) ("A partnership agreement creates a fiduciary relationship among the members of the partnership. It is a contract based upon personal trust and confidence."). We note that the record shows that the trustee in Sumlin's Chapter 7 bankruptcy never attempted to perform under the operating agreement and certainly the defendants never consented to any such assumption by the bankruptcy trustee of Sumlin's contractual rights and duties as either a member, a manager, or an administrative manager of the LLC. In DeVore v. Marshack (In re DeVore),223 B.R. 193 (9th Cir. B.A.P. 1998), the United States Bankruptcy Appellate Panel of the Ninth Circuit discussed the operation of "technical abandonment." In DeVore, the panel stated:
 "Abandonment of estate property is governed by [11 U.S.C.] § 554, which provides:
 "'(a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.
 "'(b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.
 "'(c) Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.
 "'(d) Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate.'
"11 U.S.C. § 554 (West 1998).
 "In the absence of an order directing abandonment, subsection (c) deems abandoned to the debtor any scheduled property of the estate that is unadministered at the close of the case. 5 Collier on Bankruptcy ¶ 554.02 [7] (Lawrence P. King ed., 15th ed. 1997). This is generally referred to as a technical abandonment. In re Shelton, 201 B.R. 147, 154 (Bankr.E.D.Va. 1996). Unlike abandonment under § 554(a) or (b), an abandonment under § 554(c) occurs automatically upon case closure, without notice or hearing."
223 B.R. at 197.
Additionally, the bankruptcy appellate panel succinctly stated the law regarding exemptions under the federal bankruptcy code in the case of Chubb Son, Inc. v. Clark (In re Clark), 262 B.R. 508
(9th Cir. B.A.P. 2001). There, the panel stated:
 "An individual debtor filing for bankruptcy relief is entitled to claim certain property as exempt. See 11 U.S.C. § 522(b) (West 2000); F.R.Bankr.P. 4003(a). Any creditor and the bankruptcy trustee may object to the debtor's claimed exemptions. See F.R.Bankr.P. 4003(b). `However, absent special circumstances, these objections must be filed "within 30 days after the conclusion of the meeting of creditors held pursuant to Rule 2003(a)."' Smith [v. Kennedy (In re Smith)], 235 F.3d [472] at 475 [(9th Cir. 2000)], quoting
F.R.Bankr.P. 4003(b). If no objections are timely filed, `the property *Page 314 
claimed as exempt . . . is exempt.' 11 U.S.C. § 522(1)."
262 B.R. at 514. In the case of Gamble v. Brown (In re Gamble),168 F.3d 442 (11th Cir. 1999), the United States Court of Appeals for the Eleventh Circuit noted that with regard to property that is claimed as exempt:
 "`Unless the case is dismissed, property exempted under this section is not liable during or after the case for any debt of the debtor that arose, or that is determined under section 502 of this title as if such debt had arisen, before the commencement of the case,' with certain exceptions. See 11 U.S.C. § 522(c). `Once the property is removed from the estate [through exemption], the debtor may use it as his own.' Hall v. Finance One of Georgia, Inc. (In re Hall), 752 F.2d 582, 584 (11th Cir. 1985), abrogated on other grounds by Finance One v. Bland (In re Bland), 793 F.2d 1172, 1174 (11th Cir. 1986) (en banc)."
168 F.3d 444. We need not decide whether Sumlin's interest in the executory contract was abandoned or whether it was exempted, because, under either process, the trustee would conclusively have forgone any assumption of that interest in the contract by, at the latest, the closing of his bankruptcy case, some two months before the derivative action before us was filed. As a consequence, through the operation of § 365(e)(2), § 365(e)(1) did not apply to preclude effectuation of the ipso facto provision in § 10-12-36(b), Code of Ala. 1975.
Lastly, we conclude that in any event, § 365(e) is intended to apply only during the pendency of a bankruptcy case, and is inapplicable once the "automatic stay" against ipso facto termination has been lifted by the closing of the bankruptcy case. We agree with the reasoning inThomas American Stone Building, Inc. v. White, 142 B.R. 449 (D.Utah 1992). In Thomas, the court stated, in pertinent part:
 "Relief from the automatic stay also removes this case from the shelter of § 365(e)(1). . . .
"'. . . .'
 "Once an asset is taken from the bankruptcy estate the prohibition against bankruptcy termination clauses is no longer operative. In re Schweitzer, 19 B.R. 860, 867 (Bankr.E.D.N.Y. 1982). Judge Malugen's order removed this asset from the bankruptcy estate and therefore from the protection of § 365. After relief from the automatic stay provision the parties resumed the positions they occupied prior to the debtor being placed in bankruptcy. In re Drislor Assoc., 110 B.R. 937, 940 (D.Colo. 1990)."
142 B.R. at 453. Moreover, in Days Inn of America, Inc. v. 161 HotelGroup, Inc., supra, the court recognized the following in a footnote:
 "The legislative history provides in relevant part: `Subsection (e) invalidates ipso facto or bankruptcy clauses. These clauses, protected under present law, automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy. This frequently hampers rehabilitation efforts. . . .
 "`The unenforceability of ipso facto or bankruptcy clauses proposed under this section will require the courts to be sensitive to the rights of the nondebtor party to executory contracts and unexpired leases. . . .
 "`This subsection does not limit the application of an ipso facto or bankruptcy clause to a new insolvency or receivership after the bankruptcy case is closed. That is, the clause is not invalidated *Page 315 in toto, but merely made inapplicable during the case for the purposes of [disposition] of the executory contract or unexpired lease.' 1978 U.S.C.C.A.N. 6304-6305."
55 Conn. App. at 126 n. 10, 739 A.2d at 284-85 n. 10 (emphasis added). Thus, because the bankruptcy proceedings had been closed before the action was filed, the automatic stay was no longer in effect. Consequently, for this additional reason, § 10-12-36(b) would not have been subject to preemption by § 365(e)(1) at the time the action was filed. Therefore, Sumlin would have been divested of his member status by that time by the operation of § 10-12-36(b) and thus was without statutory standing to bring a derivative suit on behalf of the LLC.
That being so, the trial court never acquired subject-matter jurisdiction over the action, and this appeal is due to be dismissed as one taken from a void judgment.
"When a party without standing purports to commence an action, the trial court acquires no subject-matter jurisdiction. Barshop v. MedinaCounty Underground Water Conservation District, 925 S.W.2d 618, 626
(Tex. 1996) (`Standing is a necessary component of subject matter jurisdiction'). See also Raines v. Byrd, 521 U.S. 811, 117 S.Ct. 2312,138 L.Ed.2d 849 (1997); Lewis v. Casey, 518 U.S. 343, 116 S.Ct. 2174,135 L.Ed.2d 606 (1996); United States v. Hays, 515 U.S. 737, 742,115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) ('"standing `is perhaps the most important of [the jurisdictional] doctrines'"'); National Organizationfor Women, Inc. v. Scheidler, 510 U.S. 249, 255, 114 S.Ct. 798,127 L.Ed.2d 99 (1994) (`Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation.'); Romer v.Board of County Comm'rs of the County of Pueblo, supra, 956 P.2d [566] at 585 [(Colo. 1998)] (`standing is a jurisdictional prerequisite to every case and may be raised at any stage of the proceedings') (Martinez, J., dissenting); Cotton v. Steele, 255 Neb. 892, 587 N.W.2d 693 (1999). But see Hertzberg v. Zoning Bd. of Adjustment of the City of Pittsburgh,554 Pa. 249, 721 A.2d 43 (1998) (standing is not jurisdictional)."
State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1028 (Ala. 1999).
Accordingly, this appeal is dismissed.
APPEAL DISMISSED.
Moore, C.J., and See, Lyons, Brown, Johnstone, Woodall, and Stuart, JJ., concur.
[1] Sumlin's individual claims are not relevant to this appeal.
[2] Sumlin presents no argument concerning the possible application of this limiting phrase to any provision of the operating agreement. The defendants assert in their brief to this Court that "[t]he only way around these provisions of [§ 10-12-36(b)(1)] would be if an exception is set out in the company's operating agreement or if the written consent of all of the members is given. A review of the operating agreement which is enclosed in the record herein reveals no such exception." Sumlin did not respond to this declaration by the defendants in his reply brief, and he did not allude to the issue in any way in his initial brief. Consequently, this issue is not before us.