******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

GETTY PROPERTIES CORPORATION
*v.* ATKR, LLC

NECG HOLDINGS CORPORATION
*v.* PAMBY MOTORS, INC.
(SC 19298)

NECG HOLDINGS CORPORATION *v.* 331
WEST AVENUE GAS STATION, LLC
(SC 19299)

NECG HOLDINGS CORPORATION *v.* WEST
BROAD SERVICE CENTER, LLC

NECG HOLDINGS CORPORATION *v.* NAVJOT
ENTERPRISES, INC.
(SC 19300)

NECG HOLDINGS CORPORATION
*v.* HSTN, LLC
(SC 19301)

NECG HOLDINGS CORPORATION
*v.* BODAEVE, INC.

NECG HOLDINGS CORPORATION
*v.* MICA ENTERPRISES, INC.
(SC 19302)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued October 28, 2014—officially released January 27, 2015*

*John J. Morgan*, with whom, on the brief, was *Albert J. Barr*, for the appellants (defendant in each case).

*Cort T. Malone*, with whom was *Heather Spaide*, for the appellees (plaintiff in each case).

*Opinion*

EVELEIGH, J. In this consolidated summary process action,[1] the defendants, the owners of certain retail gasoline service stations,[2] appeal from the judgments of immediate possession rendered by the trial court in favor of the plaintiffs, Getty Properties Corporation (Getty Properties) and NECG Holdings Corporation (NECG), with respect to the properties on which the defendants operate their stations. The defendants claim that the trial court improperly: (1) determined that the plaintiffs' notices to quit were valid; (2) admitted into evidence the lease between Getty Properties and its tenant, Getty Petroleum Marketing, Inc. (Getty Marketing), as well as the sublease between Getty Marketing and its subtenant, Green Valley Oil, LLC (Green Valley); (3) interpreted the various pleadings and orders in Getty Marketing's bankruptcy case as terminating the lease between Getty Properties and Getty Marketing and the sublease between Getty Marketing and Green Valley; (4) found that the plaintiffs proved a prima facie case for summary process; and (5) failed to dismiss the summary process action as premature pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq. We affirm the judgments of the trial court.

The record reveals the following facts and complex procedural history.[3] Getty Properties, a real estate investment trust, owns[4] the properties on which the defendants operate retail gasoline service stations. On November 2, 2000, Getty Properties leased the properties to Getty Marketing by way of a master lease (master lease). The master lease provided, in relevant part, that Getty Marketing could sublet the properties, but that such subleases "shall be subject and subordinate to the terms and conditions of this [master] [l]ease . . . and, unless [Getty Properties] elects otherwise, shall automatically terminate upon any termination of this [master] [l]ease."

In 2009, Getty Marketing sublet the properties to Green Valley, a gasoline distributor, by way of a sublease (Green Valley sublease). The Green Valley sublease expressly referenced the master lease and provided that it was "subject and subordinate to" the master lease. The Green Valley sublease further provided: "[Green Valley] acknowledges that [Getty Marketing] derives its interests in the [properties] pursuant to the terms of the [m]aster [l]ease . . . . If [the master lease] terminates, the [Green Valley] [s]ublease shall terminate with respect to any [properties] affected . . . ." Finally, the Green Valley sublease provided: "[Green Valley] may sublet the [properties] . . . to any person or entity for [approved uses] as long as [Green Valley] is not in default of any provision of [the Green Valley] [s]ublease and the [subsequent] sublease is subject to the terms of the [Green Valley] [s]ublease."

Thereafter, Green Valley entered into an individual sub-sublease with each defendant (dealer sub-subleases), under which the defendants paid monthly rent to Green Valley in exchange for the right to possess the properties and operate retail gasoline stations thereon. The terms of the dealer sub-subleases were expressly "subject and subordinate to all ground and underlying leases . . . which may now or hereafter affect this [sub-sub]lease or the [defendants' stations], and to all renewals, modifications, consolidations, replacements and extensions thereof." The dealer sub-subleases also provided that "[i]f [Green Valley] is not the owner of the [property], then this lease shall be subject to all of the terms, provisions and conditions of the lease or other arrangement under which [Green Valley] holds the [s]tation, and *if such lease or other arrangement shall be canceled or terminated, this lease shall be automatically terminated or canceled, without any liability on the part of [Green Valley] to [the defendants]*." (Emphasis added.)

Beginning in August, 2011, and continuing for each of several months, Getty Marketing failed to pay rent, Getty Properties sent a notice of termination, and Getty Marketing subsequently cured the default. Pursuant to the master lease, nonpayment of rent constituted an event of " '[m]aterial [m]onetary [d]efault' " for which Getty Properties could properly terminate the lease. In October, 2011, Getty Marketing brought an action against Getty Properties in New York state court, claiming that Getty Properties had breached the master lease and seeking an injunction to prevent Getty Properties from terminating the lease.[5] The New York state court granted a series of temporary injunctions, requiring Getty Marketing to pay Getty Properties a percentage of its monthly rent and to deposit the remaining portion into escrow pending resolution of Getty Marketing's claims. Shortly thereafter, Getty Marketing violated these terms by failing to deposit rent into escrow. Accordingly, on November 29, 2011, Getty Properties sent yet another notice of termination to Getty Marketing—citing Getty Marketing's material monetary default for nonpayment of rent—that terminated the master lease effective December 12, 2011. On December 5, 2011, Getty Marketing filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New York.

While in bankruptcy, Getty Marketing, now the debtor-in-possession, immediately prosecuted and defended various adversary proceedings with respect to the Green Valley sublease[6] and the master lease.[7] After extensive negotiations between Getty Properties, Getty Marketing, and Green Valley, Getty Properties and Getty Marketing agreed to, and the bankruptcy court entered, a comprehensive stipulation and order dated April 2, 2012, that set forth the terms and condi-

tions under which the master lease would be rejected in bankruptcy.[8]

The April 2, 2012 order of the bankruptcy court set forth the amount of rent due and unpaid by Getty Marketing, and created a payment schedule that would allow Getty Marketing to have "temporary extensions of time" to meet its rent obligations to Getty Properties. The order provided that, if and when Getty Marketing rejected the master lease pursuant to 11 U.S.C. § 365, "upon the effective date of any rejection of the [m]aster [l]ease, the [m]aster [l]ease shall be deemed terminated and [Getty Marketing] shall immediately . . . relinquish possession and deliver the [properties] to Getty Properties . . . free and clear of all other tenancies and occupancies (which shall be deemed terminated) . . . ."[9] The order further provided that, "[f]or the avoidance of doubt, it is the intention of the parties that any rejection of the [m]aster [l]ease [in bankruptcy] . . . shall result in and shall be deemed to be a termination of the [m]aster [l]ease . . . ." Finally, the order noted that, "[n]otwithstanding any other provisions herein, this [s]tipulation and [o]rder is without prejudice to any rights that third-party tenants or occupants of the [properties] have (if any) as of the date of this [s]tipulation and [o]rder under applicable [nonbankruptcy] law. . . . [I]t is the position of Getty Properties and [Getty Marketing] that such third-party tenants or occupants have no such rights if the [m]aster [l]ease is rejected . . . ."

Because it appeared that Getty Marketing would likely reject the master lease on April 30, 2012, Getty Properties, Getty Marketing, and Green Valley began to prepare for the master lease's rejection. On April 19, 2012, Getty Properties leased some of the properties to NECG, effective May 1, 2012. On April 18, 2012, Green Valley wrote to the defendants that their sub-subleases "will terminate on April 30, 2012." Green Valley reminded the defendants that the dealer sub-subleases were "subject to the terms of a [m]aster [l]ease" which would terminate on April 30, 2012, and, thus, that Green Valley would be "unable to secure continued possessory rights in and to the [properties] . . . [which] are grounds for termination under your [sub-sublease]." Green Valley's letters included notices pursuant to the Petroleum Marketing Practices Act. See 15 U.S.C. § 2804 (2012). Soon thereafter, on April 23, 2012, Getty Properties wrote to the defendants, offering revocable license agreements that would allow the defendants to continue operating their businesses on the properties from month to month after termination of the master lease and until a more permanent relationship could be negotiated. The defendants did not accept the license agreements.

On April 30, 2012, on a motion by the official committee of unsecured creditors (committee) pursuant to the

April 2, 2012 order, the bankruptcy court entered an order "rejecting [the master lease] effective April 30, 2012 . . . ." The order provided that the rejection date of April 30, 2012, "shall be deemed the '[t]ermination [d]ate' for all purposes under the [m]aster [l]ease . . . [and that] [a]ny third party . . . may conclusively rely on this [o]rder . . . as evidence of the termination of the [m]aster [l]ease and all leasehold interests of [Getty Marketing] therein and in the [properties] and the other matters provided for herein." The order provided that, "[n]otwithstanding any [b]ankruptcy [r]ule to the contrary, this [o]rder shall be immediately effective and enforceable upon its entry" and that, "without further action or proceeding or order of this [c]ourt, [Getty Marketing] shall relinquish possession of and deliver the [properties] to Getty Properties . . . free and clear of all liens and encumbrances."

Despite the fact that the April 30, 2012 order unambiguously rejected and purported to terminate the master lease, on the same day, the committee filed a motion for a separate order confirming that all subleases had indeed been rejected as of that date. It did so "[o]ut of an abundance of caution" to "erase any question regarding the rejection of the [s]ubleases . . . ."[10] Although an order had not yet entered on the committee's motion dated April 30, 2012, on May 3, 2012, Getty Properties wrote to the defendants, demanding that they either enter into the revocable license agreements or vacate the properties. In the letters, Getty Properties indicated that the defendants, after rejecting the revocable license agreements, had sent "rent" checks to Getty Properties. Getty Properties returned the unendorsed "rent" checks to the defendants in the May 3, 2012 letters and explicitly rejected the defendants' "proposed arrangement . . . ."

On May 15, 2012, Getty Properties and NECG served the defendants with notices to quit,[11] which stated that the defendants "originally had the right or privilege to occupy [the properties] but such right or privilege has terminated."

On May 18, 2012, the bankruptcy court issued an order on the committee's April 30, 2012 motion, confirming that any subleases of the master lease were "deemed rejected, nunc pro tunc, to April 30, 2012, immediately following the rejection of the [m]aster [l]ease."[12]

After the defendants refused to vacate the properties, the plaintiffs commenced summary process actions against the defendants. The cases were consolidated and presented before the Complex Litigation Docket. Prior to trial, the defendants moved to dismiss the actions, claiming that the plaintiffs' notices to quit were invalid, thus depriving the trial court of subject matter jurisdiction. The defendants also claimed that the trial court should dismiss the actions because of the defen-

dants' pending lawsuit against Green Valley in the United States District Court for the District of Connecticut for alleged violations of the Petroleum Marketing Practices Act.[13] The trial court denied the defendants' motion.

After a bench trial and in a series of opinions beginning on May 3, 2013, the trial court rendered judgment of immediate possession for the plaintiff in each case. The defendants appealed from the judgments of the trial court, claiming that the trial court improperly: (1) determined that the plaintiffs' notices to quit were valid; (2) admitted the master lease and the Green Valley sublease into evidence; (3) interpreted the various pleadings and orders in Getty Marketing's bankruptcy case as terminating the master lease and the Green Valley sublease; (4) found that the plaintiffs proved a prima facie case for summary process; and (5) failed to dismiss the summary process action as premature pursuant to the Petroleum Marketing Practices Act. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. We affirm the judgments of the trial court.

I

NOTICES TO QUIT

The defendants first claim that the trial court had no subject matter jurisdiction over the summary process actions because it improperly determined that the notices to quit were valid. Specifically, the defendants claim that: (1) the notices to quit did not comply with the signature requirement of General Statutes § 47a-23; (2) NECG's notices were invalid because, at the time NECG issued the notices, NECG was not authorized to conduct business in Connecticut pursuant to General Statutes § 33-921; and (3) the notices were void ab initio because the properties were assets of Getty Marketing's bankruptcy estate at the time the plaintiffs issued the notices.

We exercise plenary review over challenges to subject matter jurisdiction in a summary process action on the basis of defects in notices to quit. See *Bayer* v. *Showmotion, Inc.*, 292 Conn. 381, 388, 973 A.2d 1229 (2009). We address each of the defendants' claims in turn, with additional facts set forth as needed.

A

The defendants first claim that the notices to quit did not comply with the signature requirement of § 47a-23 because an associate of the plaintiffs' attorney signed the plaintiffs' attorney's name, followed by the associate's initials, on the notices to quit. Citing Practice Book § 4-2 (a) for support,[14] the defendants claim that § 47a-23 does not authorize an attorney to delegate the authority to sign his or her name on a notice to quit. The plaintiffs respond that the notices to quit were valid because the plaintiffs' attorney had explicitly author-

ized the associate to sign his name on his behalf. They further claim that the defendants have not shown any prejudice, noting that the defendants raised this claim on the eve of trial, eight months after service of the notices. We agree with the plaintiffs.

Section 47a-23 (a) requires that a notice to quit be given by an "owner or lessor, or such owner's or lessor's legal representative, or such owner's or lessor's attorney-at-law, or in-fact . . . ." "In order to demonstrate [their] compliance with the notices required for a proper termination, [the plaintiffs] must show that the notices given to the tenant apprised her of the information a tenant needs to protect herself against premature, discriminatory or arbitrary eviction." *Jefferson Garden Associates* v. *Greene*, 202 Conn. 128, 143, 520 A.2d 173 (1987). The defendants neither dispute that the plaintiffs' attorney and his associate legally represented the plaintiffs, nor claim that the defendants failed to receive sufficient information from the notices to quit. The defendants take issue only with the fact that the associate signed the notice to quit in the plaintiffs' attorney's name.

In *Boyles* v. *Preston*, 68 Conn. App. 596, 614, 792 A.2d 878, cert. denied, 261 Conn. 901, 802 A.2d 853 (2002), the court rejected the claim that an offer of judgment was defective because it had been signed on behalf of the attorney of record by the attorney's law partner, who "had been authorized by [the attorney of record] to sign [the attorney's] name to the document," and because "the defendant was in no way disadvantaged by the mere circumstantial defect in the filing of the offer of judgment. The document filed with the court afforded the defendant actual notice as to the existence and terms of the offer, and any irregularity with the signature could not possibly have misled or prejudiced him." See also *Bayer* v. *Showmotion, Inc.*, supra, 292 Conn. 390–91 (concluding that trial court properly retained jurisdiction despite scrivener's error on notice to quit with respect to quit date because error was circumstantial, defendant had actual notice of correct quit date, and defendant failed to raise defect for more than one year, demonstrating lack of prejudice).

The defendants' claim lacks merit. In the present case, the associate who signed the notices to quit had the plaintiffs' attorney's explicit authority to do so. See *Boyles* v. *Preston*, supra, 68 Conn. App. 615. This fact, when paired with the lack of prejudice and the defendants' delay in asserting this claim; see *Bayer* v. *Showmotion, Inc.*, supra, 292 Conn. 392; leads us to conclude that the trial court was not deprived of subject matter jurisdiction over the plaintiffs' summary process actions.

B

The defendants next claim that the notices to quit

issued by NECG were invalid because, at the time NECG issued the notices, it was a foreign corporation operating without a certificate of authority to transact business within the state and, therefore, was prohibited from maintaining an action pursuant to § 33-921 (a). The plaintiffs respond that failure to obtain a certificate of authority is a voidable defect, not an issue of subject matter jurisdiction, pursuant to § 33-921 (c), which allows a court to stay a proceeding commenced by a foreign corporation until the foreign corporation obtains a certificate of authority if it is determined that one is required. The plaintiffs also claim that, although NECG did not have a certificate of authority at the time it issued its notices to quit, it subsequently obtained the certificate of authority, thus voiding the defect, if any, in the notices. We agree with the plaintiffs. NECG's subsequent receipt of the certificate of authority cured any defect. See General Statutes § 33-921 (c); see also *United States Trust Co. of New York* v. *DiGhello*, 179 Conn. 246, 249, 425 A.2d 1287 (1979) ("[a corporate plaintiff's capacity to sue] is but a voidable defect, waived if not raised by a defendant in a timely manner").

## C

Finally, the defendants claim that, as of the dates the plaintiffs issued the notices to quit, the plaintiffs had no present rights to possess the properties and, thus, their notices to quit were void ab initio. The defendants reason that the plaintiffs issued the notices to quit on May 15, 2012, *before* the bankruptcy court issued its May 18, 2012 "Order Rejecting Certain Subleases" and, thus, that the properties remained assets of the bankruptcy estate until May 18, 2012, rendering the plaintiffs' notices to quit invalid. The plaintiffs respond by pointing to the express language of the May 18, 2012 order, which stated that the subleases were "deemed rejected, nunc pro tunc, to April 30, 2012 . . . ." The plaintiffs also point to the bankruptcy court's April 30, 2012 "Order Rejecting Master Lease with Getty Properties," which explicitly rejected the master lease effective April 30, 2012. The defendants' claim is wholly without merit. The express terms of the April 30, 2012 order unambiguously rejected the master lease as of that date, vested the plaintiffs with the present rights to possess the properties, and, thus, empowered the plaintiffs to issue valid notices to quit.

## II

## ADMISSION OF THE MASTER LEASE AND GREEN VALLEY SUBLEASE

The defendants next claim that the trial court improperly admitted the master lease and the Green Valley sublease into evidence. "It is well established that [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . When reviewing a decision to

determine whether the trial court has abused its discretion, we make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Citation omitted; internal quotation marks omitted.) *Duncan* v. *Mill Management Co. of Greenwich, Inc.*, 308 Conn. 1, 13, 60 A.3d 222 (2013). We address the defendants' claims as to each document in turn.

The defendants claim that the master lease should not have been admitted because it was facially incomplete—missing an attachment that specifically listed the defendants' properties—and that a facially incomplete document raises, as a matter of law, "a genuine question . . . as to . . . the accuracy of the copy" of a document. Conn. Code Evid. § 10-2 (A). They also claim that the trial court should have sustained the defendants' additional objections on the bases of improper foundation, hearsay, best evidence, and authentication. We disagree.

In its memorandum of decision, the trial court explained why it had overruled the defendants' objections to admission of the master lease during the bench trial. After crediting the testimony of the plaintiffs' witnesses, the trial court pointed to the fact that the defendants, in their second amended complaint for their pending action against Green Valley in the United States District Court for the District of Connecticut, admitted that they derived their possessory interests in the properties from the master lease, in essence admitting to the authenticity of the document. See footnote 13 of this opinion. The trial court also credited the plaintiffs' other evidence, which included the certified copies of deeds to the properties, as well as the Green Valley sublease and the dealer sub-subleases, all of which contained specific references to the properties. After a detailed review of the record in the present case, and after making every reasonable presumption in favor of upholding the trial court's ruling, we conclude that the trial court did not abuse its discretion in admitting the master lease into evidence.

The defendants next claim that the trial court improperly admitted the Green Valley sublease into evidence over the defendants' objections on the bases of improper foundation, competency, hearsay, best evidence, and authentication. We disagree. The plaintiffs entered the Green Valley sublease into evidence through the testimony of Kevin Shea, the executive vice president of Getty Realty Corporation, Getty Properties' parent company. Shea testified to his familiarity with the Green Valley sublease, explaining that Green Valley had supplied it to him during negotiations and discussions that took place during Getty Marketing's bankruptcy proceeding. The plaintiffs also presented the testimony of David Driscoll, the president and chief executive officer of Getty Realty Corporation, who testi-

fied that he personally participated in negotiations with Getty Marketing and Green Valley during Getty Marketing's bankruptcy proceedings. The trial court relied on Shea's and Driscoll's credible testimony in addition to the defendants' admission, in the pending Green Valley action, that the defendants derived their possessory interests in the properties from the master lease and Green Valley sublease. After a detailed review of the record in the present case, and after making every reasonable presumption in favor of upholding the trial court's ruling, we conclude that the trial court did not abuse its discretion in admitting the Green Valley sublease into evidence.

## III

## TERMINATION OF THE MASTER LEASE

The defendants next claim that the trial court improperly interpreted the various pleadings and orders in Getty Marketing's bankruptcy case as terminating the master lease and the Green Valley sublease. Specifically, the defendants claim that the trial court should have interpreted the rejection of the master lease as a voluntary surrender, thus preserving the rights of any subtenants pursuant to *Bargain Mart, Inc.* v. *Lipkis*, 212 Conn. 120, 561 A.2d 1365 (1989). The plaintiffs respond that, instead of preserving the rights of any subtenants, *Bargain Mart, Inc.*, instead supports the trial court's finding that the master lease and subleases had terminated, which thereby terminated the rights of any subtenants.[15] We agree with the plaintiffs.

We begin with the standard of review. "Summary process is a special statutory procedure designed to provide an expeditious remedy. . . . It enable[s] landlords to obtain possession of leased premises without suffering the delay, loss and expense to which, under the common-law actions, they might be subjected by tenants wrongfully holding over their terms. . . . Summary process statutes secure a prompt hearing and final determination. . . . Therefore, the statutes relating to summary process must be narrowly construed and strictly followed." (Internal quotation marks omitted.) *Waterbury Twin, LLC* v. *Renal Treatment Centers–Northeast, Inc.*, 292 Conn. 459, 466, 974 A.2d 626 (2009).

In reviewing the trial court's decision that the master lease and the Green Valley sublease had terminated, "[o]n appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light

of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Bargain Mart, Inc.* v. *Lipkis*, supra, 212 Conn. 129–30.

The defendants' claim that they retain their rights as sub-subtenants fails if *any* of the leases—the master lease, the Green Valley sublease, or the dealer sub-subleases—has terminated. The trial court found that the dealer sub-subleases had terminated, in accordance with their terms,[16] upon rejection of the master lease in bankruptcy, or upon termination of the master lease and the Green Valley sublease due to the nonpayment of rent by Getty Marketing and Green Valley.

"Service of a valid notice to quit, which terminates the lease and creates a tenancy at sufferance . . . is a condition precedent to a summary process action . . . ." (Citation omitted; internal quotation marks omitted.) *Waterbury Twin, LLC* v. *Renal Treatment Centers–Northeast, Inc.*, supra, 292 Conn. 466. "It is well settled that breach of a covenant to pay rent does not automatically result in the termination of a lease . . . rather, it gives the lessor a right to terminate the lease which he may or may not exercise. . . . In order to effect a termination, the lessor must perform some unequivocal act which clearly demonstrates his intent to terminate the lease. . . . [T]here is almost no limit to the possible words or deeds which might constitute the unequivocal act necessary to terminate the lease . . . ." (Citation omitted; internal quotation marks omitted.) Id., 472 n.17. Whether there has been a termination or voluntary surrender of a lease " 'is to be determined by the intention of the parties, and thus, it is usually a question of fact for the [trier].' " *Bargain Mart, Inc.* v. *Lipkis*, supra, 212 Conn. 129, quoting 49 Am. Jur. 2d 1052, Landlord and Tenant § 1095 (1970).

In *Bargain Mart, Inc.*, this court discussed the rights of subtenants under applicable landlord-tenant law: " 'A voluntary surrender by a principal lessee to a principal lessor, effected in a manner contrary to the provision of termination in the lease, does not affect the rights of a tenant acquired under a sublease which the lessor had authority to make. . . . Every surrender by a principal lessee is voluntary, unless the lessor enforces the right of termination in accordance with the reservation of his lease.' " (Citation omitted.) *Bargain Mart, Inc.* v. *Lipkis*, supra, 212 Conn. 126–27, quoting *Golde Clothes Shop, Inc.* v. *Silver*, 95 Conn. 678, 685–86, 112 A. 264 (1921). "[T]he determination of whether a rejection of a lease in bankruptcy operates as a 'termination' or 'voluntary surrender' will be tied to the particular circumstances of each case." *Bargain Mart, Inc.* v. *Lipkis*, supra, 133.

Although we noted in *Bargain Mart, Inc.*, that a voluntary surrender of a lease would not affect the rights of a subtenant, we also noted that "*unless the*

*rights of the sublessee are [expressly] protected by the terms of the sublease, '[t]he right of the sublessee to the possession of the premises, as against the original lessor, terminates with the lease or term of the original lessee . . . .* [Because] a subtenant holds the premises subject to the performance of the terms and conditions impressed upon the estate by the provisions of the original lease, his rights are generally held to be terminated when the original lessor declares a forfeiture of the original lessee's term based upon the latter's nonperformance of obligations imposed on him.' " (Emphasis added.) Id., 127, quoting 49 Am. Jur. 2d, supra, § 511, pp. 490–91.

*Bargain Mart, Inc.* involved a series of leases and subleases similar to the leases in the present case.[17] In *Bargain Mart, Inc.*, the primary lessor leased the premises to the primary tenant, who then sublet the premises to the subtenant. *Bargain Mart, Inc.* v. *Lipkis*, supra, 212 Conn. 121. The subtenant sub-sublet the premises to the sub-subtenant. Id., 121–22. Soon thereafter, the subtenant filed for bankruptcy and rejected its sublease with the primary tenant. Id., 122. After rejection of the sublease in bankruptcy, the primary lessor issued various notices to quit to the primary tenant, who contested the validity of the notices to quit in the subsequent summary process action. Id. Before the trial court could adjudicate the validity of the notices to quit, the primary lessor and the primary tenant settled the summary process action by stipulated judgment. Id., 123. The primary lessor then attempted to evict the sub-subtenant, claiming that it had no right to possession of the premises because the primary lease and the sublease had terminated. Id., 125. The sub-subtenant claimed rights to the premises under its sub-sublease, despite alleged terminations of the sublease in the subtenant's bankruptcy and the primary lease in the summary process action. Id.

In *Bargain Mart, Inc.*, with respect to termination of the sublease, the record revealed no evidence, other than the fact that the subtenant had rejected the sublease in bankruptcy, that the subtenant had defaulted or that the primary tenant had attempted to terminate the sublease pursuant to the terms of the sublease. Id., 131–33. After rejection of the sublease in the subtenant's bankruptcy, and for a period of five years, the sub-subtenant paid rent to the primary tenant and, later, paid rent directly to the primary lessor. Id., 124. The trial court concluded that the subtenant had voluntarily surrendered the sublease, which this court affirmed as not clearly erroneous on the basis of two operative facts: (1) there was no evidence that the subtenant had defaulted on the obligations imposed by the sublease and, therefore, the primary tenant could not have terminated the sublease pursuant to the terms of that lease; and (2) the postrejection conduct of the primary lessor and the primary tenant—in particular, their acceptance

of the sub-subtenant's rent—evinced an intent to treat the rejection of the sublease as a voluntary surrender. Id., 130–33. With respect to the primary lease and the summary process action settled by stipulated judgment, this court agreed that a valid notice to quit terminates a lease because it is an unequivocal notice of a landlord's intent to terminate a lease. Id., 134–35. Nevertheless, because the primary tenant had contested the validity of the notices to quit in the summary process action, and because the trial court had not adjudicated the validity of those notices prior to the stipulated judgment, this court held that the trial court's finding that the notices had not terminated the primary lease was not clearly erroneous. Id., 135.

Turning to the facts in the present case, we first look to whether rejection of the master lease in Getty Marketing's bankruptcy effected its termination. Unlike in *Bargain Mart, Inc.*, in which there was no evidence of the subtenant's default prior to the subtenant's rejection of the sublease in bankruptcy, the record in the present case is replete with evidence of Getty Marketing's material monetary defaults under the terms of the master lease prior to its rejection of the master lease in bankruptcy. Accordingly, Getty Properties was well within its rights to terminate the master lease pursuant to the master lease's express terms, which it attempted to do multiple times with multiple notices to quit. Though Getty Properties was unsuccessful in terminating the master lease, at first, because Getty Marketing obtained injunctive relief from the New York state court and, later, because Getty Marketing filed for bankruptcy, the trial court's finding that the bankruptcy court's order dated April 30, 2012 effected a termination of the master lease pursuant to the master lease's terms and on the basis of Getty Marketing's material monetary defaults was not clearly erroneous.

Moreover, unlike in *Bargain Mart, Inc.*, the plaintiffs' and Getty Marketing's postrejection conduct did not evince an intent to treat rejection of the master lease as a voluntary surrender. In *Bargain Mart, Inc.*, the primary tenant, and later the primary lessor, accepted rent from the sub-subtenant for years after rejection of the sublease in bankruptcy. Id., 124. In the present case, postrejection, the plaintiffs immediately rejected the defendants' "rent" checks and explicitly eschewed the defendants' "proposed arrangement" to remain sub-subtenants.

Given the parties' prerejection defaults and postrejection conduct,[18] and because "the determination of whether a rejection of a lease in bankruptcy operates as a 'termination' or 'voluntary surrender' will be tied to the particular circumstances of each case"; *Bargain Mart, Inc.* v. *Lipkis*, supra, 212 Conn. 133; we conclude that the trial court's finding that the rejection of the master lease in bankruptcy had been a termination was

not clearly erroneous. Accordingly, because termination of the master lease caused termination of the Green Valley sublease and the dealer sub-subleases pursuant to their terms, and because the Green Valley sublease and the dealer sub-subleases did not provide any protection to sub-subtenants in the event of termination of the master lease; see id., 127; the trial court properly found that the defendants retained no rights as sub-subtenants under this court's decision in *Bargain Mart, Inc.*

IV

PRIMA FACIE SUMMARY PROCESS

The defendants next claim that the plaintiffs did not satisfy their burden of persuasion in proving a prima facie case for summary process. Specifically, the defendants claim that the plaintiffs failed to prove: (1) each link in the properties' chain of possession from the plaintiffs to the defendants; and (2) termination of the master lease. We disagree and address each of these claims in turn, having already set forth the standard of review in part III of this opinion. See id., 129–30.

The defendants first claim that the master lease and the Green Valley sublease should not have been admitted into evidence and that, even if the leases had been properly admitted, the trial court should not have given them any weight. The defendants claim that, without these leases, the plaintiffs cannot prove each link in the properties' chain of possession from the plaintiffs to the defendants. We disagree. In light of our conclusion with respect to the defendants' evidentiary claims, as set forth in part II of this opinion, and after careful review of the record, the trial court properly concluded that the plaintiffs satisfied their burden of proof that they are the owners and lessors of the properties.

The defendants next claim that the plaintiffs failed to prove termination of the master lease—and thus that the defendants were not entitled to possess the properties—because: (1) there was no proof of an underlying default by Getty Marketing; (2) there was no proof that Getty Properties issued a notice of default to Getty Marketing; and (3) there was no proof that the plaintiffs successfully litigated, to conclusion, the many lawsuits that could have caused termination of the master lease. We disagree. As discussed previously in part III of this opinion, the record is replete with evidence of Getty Marketing's various defaults, as well as evidence sufficient to support the trial court's finding that the master lease had terminated. See footnote 3 of this opinion. Accordingly, we agree with the trial court's conclusion that the plaintiffs established a prima facie case for summary process.

V

PETROLEUM MARKETING PRACTICES ACT

Finally, the defendants claim that the plaintiffs have not established termination of the defendants' franchises, which they claim is a "condition precedent" to these summary process actions. Specifically, they claim that the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq., and the Connecticut Franchise Act, General Statutes § 42-133mm et seq., render this action "premature" because those acts may afford the defendants rights of first refusal. They also claim that 15 U.S.C. § 2806 (a) of the Petroleum Marketing Practices Act preempts these summary process actions. Finally, the defendants invoke the prior pending action doctrine, claiming that their rights in the properties are being litigated in the United States District Court for the District of Connecticut. See footnote 13 of this opinion. Although the defendants cite to some relevant authority in support of their claims for preemption and the prior pending action doctrine in a conclusory fashion, they undertake no analysis or application of the law to the facts of this case. The defendants make only one citation from the record, despite the prolixity of the materials they submitted to this court, in support of their claims. We consider these claims to be inadequately briefed and therefore decline to address them. See *Electrical Contractors, Inc.* v. *Dept. of Education*, 303 Conn. 402, 444 n.40, 35 A.3d 188 (2012) ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of 'conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . .' " [Citations omitted.]).

The judgments are affirmed.

In this opinion the other justices concurred.

[1] There were originally twenty individual case captions included within the five different Supreme Court docket numbers in these appeals. Under SC 19298, the cases were: Getty Properties Corporation *v.* ATKR, LLC; NECG Holdings Corporation *v.* UNHK, LLC; NECG Holdings Corporation *v.* Saud Alkulaib; NECG Holdings Corporation *v.* Expert Automotive Repairs; NECG Holdings Corporation *v.* Indtur, LLC; NECG Holdings Corporation *v.* Mujtaba Khalied; NECG Holdings Corporation *v.* Pamby Motors, Inc.; and NECG Holdings Corporation *v.* RHS, LLC. Under SC 19299, the case was: NECG Holdings Corporation *v.* 331 West Avenue Gas Station, LLC. Under SC 19300, the cases were: NECG Holdings Corporation *v.* West Broad Service Center, LLC; two separate cases of NECG Holdings Corporation *v.* Adnan Akach; NECG Holdings Corporation *v.* JZ Mart, LLC; and NECG Holdings Corporation *v.* Navjot Enterprises, Inc. Under SC 19301, the cases were: Getty Properties Corporation *v.* Adnan Rahim; NECG Holdings Corporation *v.* Shahid Siddiq; and NECG Holdings Corporation *v.* HSTN, LLC. Under SC 19302, the cases were NECG Holdings Corporation *v.* Bodaeve, Inc.; NECG Holdings Corporation *v.* Mica Enterprises, Inc.; and NECG Holdings Corporation *v.* Wilton Service Center, Inc. Many of the cases were subsequently withdrawn. The case caption in the present appeals lists the eight remaining cases under the pertinent Supreme Court docket numbers.

[2] The defendants are: ATKR, LLC; Pamby Motors, Inc.; 331 West Avenue Gas Station, LLC; West Broad Service Center, LLC; Navjot Enterprises, Inc.; HSTN, LLC; Bodaeve, Inc.; and Mica Enterprises, Inc.

[3] To the extent that further details about the panoply of related lawsuits involving these parties are necessary, this court takes judicial notice of the files in these other cases. See *Jewett* v. *Jewett*, 265 Conn. 669, 678–79 n.7, 830 A.2d 193 (2003); *Drabik* v. *East Lyme*, 234 Conn. 390, 398, 662 A.2d

118 (1995).

[4] We note that Getty Properties' interest in one parcel is actually derived from a lease with its wholly owned subsidiary. This does not alter our analysis.

[5] Specifically, Getty Marketing alleged that Getty Properties failed to remediate environmental contamination on some of Getty Marketing's properties and, thus, sought to offset its rent by the amount Getty Properties should have paid to remediate the contamination. It therefore sought to pay reduced rent and to enjoin Getty Properties from terminating the master lease for nonpayment of rent.

[6] On December 16, 2011, Getty Marketing served notice of default on Green Valley, prompting Green Valley to file an adversary proceeding against Getty Marketing in which it sought an injunction prohibiting termination of the Green Valley sublease and a declaration that Green Valley was not in default of the sublease. After Green Valley's voluntary withdrawal of the adversary proceeding, Getty Marketing served Green Valley with another notice of default on December 22, 2011 for Green Valley's failure to pay December's rent. After Green Valley failed to cure the default, Getty Marketing issued a notice of termination on January 7, 2012, and subsequently filed an adversary proceeding against Green Valley seeking payment of the unpaid rent. On January 24, 2012, the bankruptcy court entered a stipulation and order requiring Green Valley to pay various amounts in installment payments. The order also required Green Valley to vacate the properties on or before March 31, 2012. After Green Valley vacated the premises, Getty Marketing filed a motion for summary judgment on its adversary proceeding against Green Valley, seeking the unpaid rent owed by Green Valley through March 31, 2012. The bankruptcy court granted Getty Marketing's motion for summary judgment and ordered judgment to enter against Green Valley for the unpaid rent.

[7] On December 21, 2011, Getty Marketing filed an adversary proceeding against Getty Properties for its alleged breach of the master lease for failing to remediate environmental contamination. See footnote 5 of this opinion. On January 10, 2012, the bankruptcy court ordered Getty Marketing to comply with its postpetition lease obligations by paying rent going forward, plus interest on any amounts already due and unpaid. This adversary proceeding appears to have been abandoned.

[8] The terms of the master lease notably provided that, "in the context of [Getty Marketing's] attempted rejection, assumption and/or assignment of this [master] [l]ease in any bankruptcy or other insolvency proceeding affecting [Getty Marketing] . . . the parties hereto intend for such rejection to terminate this [master] [l]ease . . . ."

[9] The order also provided that, if any third-party subtenants or occupants failed to vacate the premises as of the date of rejection of the master lease and if Getty Properties incurred expenses in eviction proceedings, Getty Properties would have the right to assert claims against Getty Marketing "on account of such [e]viction [e]xpenses solely to the extent allowable under the [m]aster [l]ease (as if the [m]aster [l]ease had been terminated according to its terms by reason of the default of [Getty Marketing]) . . . ."

[10] The committee also requested the order to "[clarify] such date for proof of claim bar date purposes . . . [and to] ensure, out of an abundance of caution, that the [d]ebtors and their estates do not unwittingly incur any additional obligations under such [s]ubleases . . . [and] make clear that the [s]ubtenants may assert claims for rejection damages . . . . Such clarity and certainty is in the best interests of the [d]ebtors, the estate, and the subtenants."

[11] Although some cases in this consolidated action have factual differences, such as whether Getty Properties or NECG issued the notice to quit to a particular defendant, these differences do not alter our analysis. The parties have stipulated that all of the relevant documents in each case contain the same relevant terms. Unless relevant to our discussion, we will not further discuss the exact differences in each case.

[12] The Latin phrase "nunc pro tunc" literally means "now for then" and is defined as "[h]aving retroactive legal effect through a court's inherent power . . . ." Black's Law Dictionary (9th Ed. 2009).

[13] The defendants referred to a complaint they filed on March 28, 2012, under the trade name of the United Dealers of CT, in the United States District Court for the District of Connecticut. The defendants filed an action against Green Valley and its members, which do not include Getty Properties or NECG, for breach of the dealer sub-subleases, violations of the Petroleum Marketing Practices Act, and violations of the Connecticut Franchise Act;

see General Statutes § 42-133mm et seq.; among other claims.

A second federal action is pending in the United States District Court for the District of Connecticut. Specifically, the plaintiffs filed an action against the defendants on June 11, 2012, alleging conversion of property, trademark infringement, and violations of the Connecticut Unfair Trade Practices Act; see General Statutes § 42-110a et seq.; among other claims. Both federal actions have been placed on the inactive list pending this court's resolution of the present summary process appeals.

[14] Practice Book § 4-2 (a) provides in relevant part: "Every pleading and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name. . . ."

[15] The defendants also claim that the order of the bankruptcy court dated April 2, 2012, expressly protected the defendants from termination of the master lease. That order specifically provided that its provisions were "without prejudice to any rights that third-party tenants or occupants of the [properties] have (if any) as of the date of this [s]tipulation and [o]rder under applicable [nonbankruptcy] law." This court's analysis of the defendants' claim under *Bargain Mart, Inc.*, addresses the defendants' claim under the April 2, 2012 order. See *Bargain Mart, Inc.* v. *Lipkis*, supra, 212 Conn. 128 ("[in a bankruptcy] [w]here a debtor/sublessor has rejected the primary lease, state law establishes the subtenants' rights under the sublease").

[16] As stated previously in this opinion, the dealer sub-subleases provided: "If [Green Valley] is not the owner of the [properties], then this lease shall be subject to all of the terms, provisions and conditions of the lease or other arrangement under which [Green Valley] holds the [properties], and if such lease or other arrangement shall be canceled or terminated, this lease shall be automatically terminated or canceled, without any liability on the part of [Green Valley] to [the defendants]."

[17] We note that the parties in *Bargain Mart, Inc.*, transferred their interests to various third parties. See *Bargain Mart, Inc.* v. *Lipkis*, supra, 212 Conn. 121–22. Because those transfers are not relevant to our resolution of the present case, we omit them from our discussion.

[18] To the extent that the plaintiffs and Getty Marketing memorialized their intentions by agreement, the master lease is instructive. See *Bayer* v. *Showmotion, Inc.*, supra, 292 Conn. 409 (" '[w]here there is definitive contract language, the determination of what the parties intended by the contractual commitments is a question of law' "). The master lease provided that, "in the context of the [Getty Marketing's] attempted rejection, assumption and/or assignment of this [master] [l]ease in any bankruptcy or other insolvency proceeding affecting [Getty Marketing] . . . the parties hereto intend for such rejection to terminate this [master] [l]ease . . . ." Given the abundance of other evidence of termination in the record, however, we neither rely on nor express any opinion about the validity of the parties' prebankruptcy agreement to treat rejection of the master lease in bankruptcy as a termination thereof.

Although we acknowledge that, "[w]here a landlord has not terminated the tenant's lease, the landlord and tenant cannot unilaterally undertake to eliminate the sublessee's interests"; *Bargain Mart, Inc.* v. *Lipkis*, supra, 212 Conn. 137; the April 2, 2012 order, signed by Getty Properties and Getty Marketing, and approved and entered by the bankruptcy court, provided that, "[f]or the avoidance of doubt, it is the intention of the parties that any rejection of the [m]aster [l]ease [in bankruptcy] . . . shall result in and shall be deemed to be a termination of the [m]aster [l]ease . . . ."